*Chateau Foghorn LP v. Wesley Hosford*, No. 73, September Term, 2016.  Opinion by Getty, J.

**CONSTITUTIONAL LAW — PREEMPTION — CONFLICT PREEMPTION — LANDLORD-TENANT LAW — MARYLAND CODE (1974, 2010 REPL. VOL.), REAL PROPERTY ARTICLE § 8-402.1**

The Court of Appeals held that Maryland Code, Real Property Article § 8-402.1(b)(1), which provides that a court ruling on a landlord-tenant dispute must conclude that a breach of a lease is "substantial and warrants an eviction" before granting judgment for possession of the leased premises, is not preempted by federal law and regulations mandating that federally-subsidized Section 8 project-based housing developments include provisions in their tenant lease agreements to provide that engaging in any drug-related criminal activity on or near the leased premises is grounds for termination of the lease.

Circuit Court for Baltimore City
Case No. 24-C-14-005119
Argued: March 30, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 73

September Term, 2016

CHATEAU FOGHORN LP

v.

WESLEY HOSFORD

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

Opinion by Getty, J.

Filed: August 28, 2017

"The Government of the United States, . . . though limited in its powers, is supreme; and its laws, when made in pursuance of the Constitution, form the supreme law of the land[.]"

> Chief Justice John Marshall, *McCulloch v. Maryland*, 17 U.S. 316, 406 (1819).

"[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

> Justice John Paul Stevens, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citations and internal quotation marks omitted).

In all cases involving the interplay between the laws issued by the federal government and those enacted by the states, courts must balance the twin principles stated above: First, pursuant to the Supremacy Clause,[1] federal law enacted under the delegated powers and authority of the federal government is the supreme law of the land; Second, there is a presumption against federal laws or regulations preempting or superseding state laws, particularly in fields that have historically been the province of the states.

---

[1] Article VI, Section 2 of the United States Constitution provides,

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding.

In the instant case we are called upon to apply those principles to Maryland Code, (1974, 2010 Repl. Vol.), Real Property Article ("RP") § 8-402.1, which provides that a court ruling on a landlord-tenant dispute must conclude that a breach of a lease is "substantial and warrants an eviction" before granting judgment for possession of the leased premises. We must decide whether the Maryland statute conflicts with, and is thus preempted by, federal law and regulations mandating that federally-subsidized Section 8 project-based housing developments include provisions in their tenant lease agreements to provide that engaging in any drug-related criminal activity on or near the leased premises is grounds for termination of the lease. For the following reasons, we shall conclude that RP § 8-402.1 does not conflict with the congressional intent behind the federal law and regulations at issue and, therefore, we shall hold that the statute is not preempted by federal law.

**I.**
**BACKGROUND**

Wesley Hosford, the Respondent, is severely disabled and has been wheelchair-bound since 1987. He suffers from incomplete paralysis in his extremities, with muscle spasms and sensations leaving him in daily pain.[2] Since 1989, Mr. Hosford has resided at Ruscombe Gardens Apartments, an apartment building in Baltimore City owned by Chateau Foghorn LP ("Foghorn"), the Petitioner. Ruscombe Gardens Apartments provides

---

[2] Mr. Hosford's condition is referred to in the record as either "quadriplegia" or "quadriparesis."

housing for low-income elderly and disabled tenants that is subsidized through a federal

"Section 8" project-based rental subsidy program.[3]

In 2012, Mr. Hosford renewed his lease with Ruscombe Gardens, and signed a

"Drug-Free Housing Policy" addendum to the lease, which provided, in pertinent part,

DRUG-FREE HOUSING POLICY

IN CONSIDERATION of the execution or renewal of the lease of the dwelling unit identified in the lease, Owner and Tenant agree as follows:

1.      Tenant, any member of tenant's household, or a guest or other person under the tenant's control shall not engage in or facilitate criminal activity on or near the project, including, but not limited to, violent criminal activity or drug-related criminal activity. . . .

2.      Tenant or any member of tenant's household, or a guest or other person under the tenant's control shall not <u>engage in any act intended to facilitate criminal activity</u>, including drug-related criminal activity on or near the project premises.

3.      Tenant or members of the household will not permit the dwelling unit to be used, or to facilitate, criminal activity, including drug-related criminal activity or possession of drug paraphernalia, regardless of whether the individual engaging in such activity is a member of the household or a guest.

4.      Tenant or member will not engage in the manufacture, sale, or distribution of illegal drugs at any location, whether on or near project premises or otherwise.

* * *

6.      <u>VIOLATION OF THE ABOVE PROVISIONS SHALL BE A MATERIAL VIOLATION OF THE LEASE AND GOOD CAUSE FOR TERMINATION OF TENANCY.</u>  A single violation of any of the provisions of this policy shall be deemed a serious violation and a

---

[3] The "Section 8" project-based rental program is discussed in greater detail in Part III.B of this opinion.

material noncompliance with the lease. Unless otherwise provided by law, proof of violation shall not require criminal conviction, but shall be by a preponderance of the evidence.

(Emphasis in original.)

In 2014, Ruscombe Gardens Apartments was experiencing a bed bug infestation, and Foghorn hired an extermination company to treat units in the complex. On June 10, 2014, two exterminators entered Mr. Hosford's unit to perform extermination treatment and saw a marijuana plant growing in a pot in his bathtub.[4] They reported this to the apartment's management office. A security guard employed by Ruscombe Gardens Apartments went to Mr. Hosford's unit and saw the same marijuana plant.

Thereafter, police were called, and an officer responded and came to Mr. Hosford's unit. The officer examined the plant in the bathroom, concluded it was marijuana, and confiscated it. He then issued Mr. Hosford a criminal citation for the possession of marijuana. A police chemist tested the plant found in the apartment and concluded that it was marijuana. Subsequently, Mr. Hosford was charged in the District Court of Maryland sitting in Baltimore City with possession of less than ten grams of marijuana. Ultimately, a *nolle prosequi* was entered as to that charge.

In June 2014, Foghorn gave Mr. Hosford a notice of termination of his lease. When he did not vacate the unit within thirty days of that notice, Foghorn initiated an eviction action pursuant to RP § 8-402.1[5] against Mr. Hosford in the District Court of Maryland

---

[4] The exterminators also saw a light machine that Foghorn contends was a "grow light" for marijuana cultivation.

[5] RP § 8-402.1 ("Breach of Lease") provides in pertinent part (emphasis added),

4

(a) *Complaint to District Court; summons to appear; notice; continuance.*—

(1)    (i) Where an unexpired lease for a stated term provides that the landlord may repossess the premises prior to the expiration of the stated term if the tenant breaches the lease, the landlord may make complaint in writing to the District Court of the county where the premises is located if:

1. The tenant breaches the lease;

2.    A. The landlord has given the tenant 30 days' written notice that the tenant is in violation of the lease and the landlord desires to repossess the leased premises; or

B. The breach of the lease involves behavior by a tenant or a person who is on the property with the tenant's consent, which demonstrates a clear and imminent danger of the tenant or person doing serious harm to themselves, other tenants, the landlord, the landlord's property or representatives, or any other person on the property and the landlord has given the tenant or person in possession 14 days' written notice that the tenant or person in possession is in violation of the lease and the landlord desires to repossess the leased premises; and

3. The tenant or person in actual possession of the premises refuses to comply.

(ii) The court shall summons immediately the tenant . . . to appear before the court on a day stated in the summons to show cause, if any, why restitution of the possession of the leased premises should not be made to the landlord.

\* \* \*

5

sitting in Baltimore City, claiming that Mr. Hosford had breached the terms of the drug-free housing agreement addendum to his lease.  Mr. Hosford thereafter filed a timely prayer for a jury trial in the circuit court, claiming that the value of his right to continued occupation of his apartment exceeded the $15,000 threshold set by statute.[6]

The case was subsequently transferred to the Circuit Court for Baltimore City for a jury trial.  Prior to the scheduled date of trial, Foghorn filed a motion for summary judgment with a supporting memorandum, asserting:

- That there was no genuine dispute of fact that Mr. Hosford had possessed marijuana in his apartment;

---

(b) *Judgment of the District Court; appeal.*—

(1) **If the court determines that the tenant breached the terms of the lease and that the breach was substantial and warrants an eviction**, the court shall give judgment for the restitution of the possession of the premises and issue its warrant to the sheriff or a constable commanding the tenant to deliver possession to the landlord. . . .

[6] Maryland Code, Courts & Judicial Proceedings § 4-402(e)(1) provides that "[i]n a civil action in which the amount in controversy does not exceed $15,000, exclusive of attorney's fees if attorney's fees are recoverable by law or contract, a party may not demand a jury trial pursuant to the Maryland Rules."  The amount in controversy in an action for eviction is the value of the tenant's right of continued possession.  *See Carroll v. Hous. Opportunities Comm'n*, 306 Md. 515, 525 (1986).  We have previously noted that under applicable case law and federal regulations, a tenant in a federally-subsidized housing unit where a lease renews automatically has "a continuing right of possession to the unit for an indefinite time period[,]" so long as there is no material breach of a lease.  *Cottman v. Princess Anne Villas*, 340 Md. 295, 298 (1995).  Therefore, we have held that to value a tenant's right of possession in such a case, a court must first determine the yearly fair market value of the unit, and then multiply that value by the expected life span of the tenant. *Id.* at 299.  Here, Mr. Hosford's lease contains an automatic renewal provision.  And, Foghorn has not contested on appeal before this Court or the Court of Special Appeals that the application of such a formula in the instant case yields an amount over $15,000.  *See Hosford v. Chateau Foghorn LP*, 229 Md. App. 499, 504 n.2 (2016).

6

- That, while Mr. Hosford had not been convicted of a crime for that marijuana possession, his possession of marijuana was illegal under federal law and, at the time of his citation by a Baltimore City police officer, was also illegal under Maryland law, and therefore constituted "drug-related criminal activity" in violation of the drug-free housing policy addendum to Mr. Hosford's lease;

- That the provisions of the drug-free housing policy addendum permitting eviction for drug-related criminal activity to Mr. Hosford's lease were mandated by federal law and regulations governing leases for federally-subsidized housing; and,

- That the requirement in RP § 8-402.1 that a trial court order eviction only if a tenant's breach is "substantial and warrants an eviction" should be held to be preempted by federal law in Mr. Hosford's case, because that requirement conflicts with federal law and regulations governing the Section 8 project-based housing program which, according to Foghorn, "have vested [Foghorn] with the discretion to determine whether drug-related criminal activity by a tenant is substantial and warrants eviction, without any qualifications."

In response, Mr. Hosford claimed that there was a dispute of material fact as to whether the plant in his apartment was marijuana. He also noted that his criminal citation was for possession of less than ten grams of marijuana. And, he presented medical records to show his history of muscle spasms and other sensations and pain as a result of his paralysis, along with an expert affidavit that the use of marijuana "is likely to provide . . . therapeutic or palliative relief" from such symptoms. On the basis of that information, he asserted that even if he had possessed marijuana his actions did not constitute a criminal offense pursuant to Maryland Code, Criminal Law Article ("CR") §§ 5-601(c)(2)(ii) or 5-602(c)(3)(iii)(1), and thus were not a breach of his lease. Finally, he contended that even if he had breached the terms of his lease, the trial court could still determine whether the breach was "substantial and warrants an eviction" pursuant to RP § 8-402.1.

7

On March 18, 2015, the circuit court held a hearing on Foghorn's motion for summary judgment. On March 23, 2015, the circuit court issued a written order granting summary judgment in favor of Foghorn as well as a judgment of restitution of possession. In a thorough and well-written memorandum opinion accompanying its order, the circuit court set forth its reasoning for granting summary judgment.

The circuit court began by addressing the evidence as to Mr. Hosford's possession of marijuana. The circuit court noted that Foghorn had provided a certified Laboratory Report from the police chemist stating that material from the plant had been analyzed and found to contain marijuana. The circuit court therefore concluded that there was not a dispute of material fact that a marijuana plant was found growing in Mr. Hosford's rental unit.

The circuit court then turned to whether Mr. Hosford's possession of marijuana was illegal activity. The circuit court noted that Maryland no longer "punishes the possession of less than ten grams of marijuana as a crime[,]" as CR § 5-601(c)(2)(ii) now provides that possession of less than ten grams of marijuana is "a civil offense." However, the court also noted that the law amending CR § 5-601 to add that provision did not become effective until October 1, 2014—more than four months after the marijuana plant was discovered in Mr. Hosford's apartment. *See* 2014 Md. Laws ch. 158. Thus, that provision did not apply to Mr. Hosford's case.

The circuit court also addressed another statutory provision raised by Mr. Hosford, CR §§ 5-601(c)(3)(iii)(1), which provides that it is an "affirmative defense" in a prosecution for marijuana if a defendant can show that he has a "debilitating medical

8

condition" for which "marijuana is likely to provide the defendant with therapeutic or palliative relief." Although the circuit court noted that no appellate court had yet considered the effect of that affirmative defense, the court concluded that "the statute and the ordinary operation of affirmative defenses in criminal cases suggest that a defendant successfully asserting the affirmative defense would escape conviction altogether." Therefore, the circuit court concluded that "if Maryland law alone were the basis for [Foghorn's] assertion of criminal activity by Mr. Hosford," then his conduct might not be considered criminal.

However, the circuit court noted that, under federal law, marijuana remains a Schedule I controlled substance.[7] And the circuit court concluded that, unlike under Maryland law, there was no "explicit or implicit necessity exception for the medical use of marijuana" in the federal Controlled Substances Act.[8] The circuit court therefore held that "[Foghorn] may proceed on the basis that the possession of any quantity of marijuana is a crime under federal law."

The circuit court then turned to the last remaining issue, whether the court or a jury is "allowed to review the landlord's exercise of discretion in treating this particular possession of marijuana as warranting termination of the lease and eviction." The circuit court characterized the issue as one of federal preemption, stating,

---

[7] *See* 21 U.S.C. § 812 (listing "marihuana" as a Schedule I controlled substance).

[8] In support of its ruling, the circuit court cited *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 493 (2001) (holding that there was no defense of medical necessity for marijuana use or possession because "Congress has made a determination that marijuana has no medical benefits worthy of an exception").

Federal law compels [Foghorn] to include in its leases for subsidized housing provisions that forbid tenants from engaging in or permitting any criminal drug activity on the premises and that give it the authority to evict a tenant for breaching that promise. *See Dep't of Housing and Urban Dev. v. Rucker*, 535 U.S. 125, 130-31 (2002). Although these terms are strict, the severity is tempered by federal regulations giving landlords some measure of discretion in deciding whether to seek eviction. *Id.* at 128-29. [Foghorn] argues that this federal law preempts RP § 8-402.1(b)(1) to the extent [it] vests in Maryland courts discretion to determine either that an alleged breach is substantial or that it warrants eviction.

In analyzing the preemption issue, the circuit court discussed *Brown v. Housing Opportunities Commission*, 350 Md. 570 (1998) and *Grady Management, Inc. v. Epps*, 218 Md. App. 712 (2014), as cases dealing with the relationship between RP § 8-402.1 and federal regulations governing federally-subsidized housing. However, the circuit court concluded that neither case provided significant guidance, as neither involved an issue of preemption.

Instead, the circuit court relied upon three out-of-state cases: *Milwaukee City Housing Authority v. Cobb*, 860 N.W.2d 267 (Wis. 2015); *Boston Housing Authority v. Garcia*, 871 N.E.2d 1073 (Mass. 2007); and *Scarborough v. Winn Residential L.L.P./Atlantic Terrace Apartments*, 890 A.2d 249 (D.C. 2006).[9] The circuit court concluded that all three out-of-state cases stood for the proposition that "although federal law vests a landlord renting subsidized housing with discretion not to pursue eviction in all instances of criminal activity, state *courts* cannot be given discretion to overrule the landlord's exercise of discretion." (Emphasis in original.) Therefore, the circuit court held

---

[9] We will discuss both the Maryland and out-of-state cases considered by the circuit court, along with other relevant authority, in part III.B of this opinion.

10

that the requirement in RP § 8-402.1(b)(1) that a court must determine that a tenant's breach "was substantial and warrants an eviction" before awarding a judgment of possession "is preempted by federal law to the extent that it would permit a judge or jury either to exercise discretion *de novo* or to review the landlord's exercise of discretion in deciding to proceed with an eviction."[10] Mr. Hosford subsequently filed a motion to alter or amend judgment, which the circuit court denied.

Thereafter, Mr. Hosford noted an appeal to the Court of Special Appeals. In a reported opinion, the Court of Special Appeals reversed the judgment of the circuit court. *Hosford v. Chateau Foghorn LP*, 229 Md. App. 499 (2016). The Court of Special Appeals considered three issues, only one of which is before us:

> 1. In an eviction action involving federally-subsidized housing, does federal law preempt the requirement in [RP] § 8-402.1 that a court must conclude that a breach of a lease be "substantial" and "warrant eviction" before granting judgment for possession of the leased premises?[11]

---

[10] In a footnote, the circuit court noted that while the parties had "assumed that all questions under RP § 8-402.1(b)(1) would be put to the jury[,]" the court was "not so certain of that assumption." The circuit court explained that "the question of whether a particular breach warrants eviction might be considered an equitable issue as to which there is not a jury trial right." The circuit court explicitly declined to reach and rule on that issue.

[11] The Court of Special Appeals also considered two other issues:

2. Was there sufficient evidence in the record to support the circuit court's conclusion that there was no genuine dispute of material fact that [Mr.] Hosford possessed marijuana in his apartment?

3. Does the possession of a small amount of marijuana for medical purposes constitute "drug-related criminal activity" in violation of the terms of [Mr.] Hosford's lease?

*Hosford*, 229 Md. App. at 502. The intermediate appellate court only briefly addressed those issues, agreeing with the circuit court's analysis that "there was no dispute of material

11

*Id.* at 502.

The Court of Special Appeals held that federal law did not preempt RP § 8-402.1. The intermediate appellate court discussed the various types of federal preemption—express, field, and conflict—and concluded that the only applicable preemption doctrine was conflict preemption. *Id.* at 510-12. The Court of Special Appeals noted that the intent of Congress is the focus of a preemption analysis. *Id.* at 510. The court also stated that in determining congressional intent, courts start "with the basic assumption that Congress did not intend to displace state law," *see id.* (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)), a presumption that is at its strongest when the particular area of law is traditionally the domain of the states. *Id.* at 510-11. The Court of Special Appeals held that "[i]n instances where federal law regulates an area traditionally within the domain of state law, the state law must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law will be overridden[.]" *Id.* at 511 (quoting *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013) (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979))).

The Court of Special Appeals determined that "landlord-tenant law is traditionally within the domain of state law[.]" *Id.* at 512. The court therefore held that under the standard of conflict preemption set forth in Supreme Court case law "the disputed portions

---

fact as to whether [Mr.] Hosford was in possession of marijuana on the day that his apartment was inspected[,]" and that "Maryland's decriminalization of possession of small amounts of marijuana does not change the fact that possession of any amount of marijuana is a violation of the federal Controlled Substances Act." *Id.* at 509.

of RP § 8-402.1 are preempted only if they cause 'major damage' to 'clear and substantial['] federal interests embedded in the federal law." *Id.*

The Court of Special Appeals then analyzed the relevant federal statute, regulations and agency guidance documents, *see id.* at 512-22, and identified two "closely-related" federal interests: first, that "residents of federally-supported housing be protected against the effects of criminal activity in general, and drug-related criminal activity in particular"; and, second, that "landlords have discretion to initiate eviction proceedings in such situations[,]" although "only by recourse to state or local landlord-tenant law" through filing an eviction action in state court. *Id.* at 508-09.[12] The Court of Special Appeals then evaluated whether RP § 8-402.1 did "major damage" to those interests so as to require preemption.

The intermediate appellate court noted that, due to the federal interest in affording landlords discretion to evict tenants for drug-related criminal activity, "a landlord does not have to consider equitable factors in determining whether to pursue eviction for drug-related conduct." *Id.* at 523. However, the Court of Special Appeals also determined that "a landlord cannot effect an eviction by itself—it must go to court and obtain a judgment entered in accordance with non-pre-empted state law." *Id.* Consequently, the Court of Special Appeals concluded that there was no federal congressional intent to require "state

---

[12] The Court of Special Appeals stated its view of the two federal interests at issue using slightly different language later in its opinion: "(1) ensuring that federally-subsidized housing remains a safe and drug-free environment; and (2) preserving a landlord's ability to initiate eviction actions against tenants that threaten the former goal." *Hosford*, 229 Md. App. at 529

13

courts to order evictions upon a finding of a breach of the lease due to drug-related activity[,]" without considering equitable considerations mandated under state law. *Id.* at 523-24.

The Court of Special Appeals concluded that, based on its analysis of the federal interests and applicable case law, "permitting State courts to exercise discretion and consider equitable factors when deciding whether to rule in a landlord's favor in an eviction action concerning federally-subsidized housing is consistent with federal law and policy." *Id.* at 529. However, the Court of Special Appeals also emphasized that a trial court's discretion to review a landlord's decision in the federally-subsidized housing context should be narrow, and that courts should presume that drug-related criminal activity "ordinarily" warrants eviction, explaining,

> We believe that courts can strike the proper balance between federal policy and state law by presuming that drug-related criminal activity is a breach that *ordinarily* warrants eviction under RP § 8-402(b)(1), but that this presumption may be rebutted by equitable factors that arise in a given case. This approach gives proper weight both to the exercise of the landlord's discretion accorded under federal law to seek eviction, and to Maryland's public policy, embodied in RP § 8-402.1(b), that tenants—especially impoverished and disabled ones—not be evicted automatically when good reasons are presented and credited to show that such eviction would be not only unduly harsh but not necessary to accommodate the Federal objectives.

*Id.* at 529-30 (emphasis in original).[13] As the circuit court did not exercise such discretion, the Court of Special Appeals reversed the grant of summary judgment. *Id.* at 530. Foghorn

---

[13] The Court of Special Appeals noted that the circuit court had explicitly declined to rule as to whether Mr. Hosford was entitled to have a jury determine whether a breach was "substantial and warrants eviction." *Hosford*, 229 Md. App. at 530 n.18. On appeal to this Court, neither party has raised the issue of whether, when an defendant in an eviction proceeding moves for a jury trial, the required determination under RP § 8-402.1(b)(1)

thereafter petitioned this Court for a writ of certiorari, which we granted on December 2, 2016.  450 Md. 661 (2016).[14]

On appeal to this Court, Foghorn presents a single question for our review,[15] which we have rephrased: Did the Court of Special Appeals err in holding that, in an eviction action for a breach of lease, the requirements in RP § 8-402.1(b)(1) that a court must determine that a tenant's breach of lease was "substantial" and "warrants an eviction" in order to award judgment for the restitution of the possession of the premises to the landlord

_____

should be made by the trial judge or may properly be submitted to the jury.  Thus, in our interpretation of the statute in this opinion we shall decline to consider that issue.

[14] After granting certiorari, we also granted two separate motions by parties seeking to file an *amici curiae* brief in this matter: one by the Maryland Multi-Housing Association, Inc. and another by the Public Justice Center, Homeless Persons Representation Project and Disability Rights Maryland.  *See* Md. Rule 8-511.

[15] In his brief to this Court on appeal, Mr. Hosford also raises the issue of whether the Court of Special Appeals erred in holding that his possession of marijuana was criminal conduct.  In essence, he contends that while the federal Controlled Substances Act penalizes the possession of marijuana, that law does not necessarily mandate the imposition of *criminal* penalties for possession of small amounts of marijuana.  *See* 21 U.S.C. § 844a (providing for civil penalties for possession of certain controlled substances in quantities indicating the substances were for personal use only).  Furthermore, notwithstanding the Supreme Court's ruling in *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 493, that there was no defense of medical necessity for marijuana use or possession under the Controlled Substances Act, Mr. Hosford maintains that more recent federal cases and policy developments have cast doubt on that ruling.  Thus, he maintains that even under federal law a defendant might be able to successfully raise a necessity defense for marijuana possession, and thereby avoid a conviction for marijuana possession.  However, while the issue of whether Mr. Hosford engaged in criminal conduct was raised and decided by the trial court and ruled upon by the Court of Special Appeals, Mr. Hosford did not file a cross-petition for certiorari to raise the issue on appeal to this Court.  Therefore, we shall not consider his claims as to this issue.  *See* Md. Rule 8-131(b)(1).

are not preempted by federal law and regulations governing federally-subsidized Section 8 project-based housing?[16]

That question can be broken down into two parts:

A. Was the Court of Special Appeals correct in holding that landlord-tenant law is an area that is traditionally within the domain of state law and, on that basis, applying a heightened presumption against federal preemption of Maryland's landlord-tenant law, including RP § 8-402.1(b)(1)?

B. If the answer to Question A is "yes," was the Court of Special Appeals correct in holding that RP § 8-402.1(b)(1) does not conflict with the congressional intent behind the statute and regulations mandating certain lease provisions in Section 8 project-based housing and, therefore, that the presumption against federal preemption is not overcome as to RP § 8-402.1(b)(1)?

For the reasons stated below, we shall hold that the Court of Special Appeals correctly concluded that landlord-tenant law is an area traditionally within the domain of the states. And, although we shall decline to endorse the "major damage" standard of review for areas of law within the traditional domain of the states, we shall hold that the intermediate appellate court correctly applied a heightened presumption against federal preemption. Finally, we shall hold that the Court of Special Appeals also was correct to hold that the presumption against preemption is not overcome as to RP § 8-402.1 because that statute does not stand in conflict with Congress' intent behind the mandatory lease

---

[16] In its petition for writ of certiorari, Foghorn phrased the question presented as follows:

> Did the Court of Special Appeals err in its preemption analysis by concluding [that] [RP § 8-402.1] does not do "major damage" to the clear and manifest intent of Congress and express language of implementing regulations?

provisions at issue. Therefore, we shall affirm the judgment of the Court of Special Appeals.

## II.
## STANDARD OF REVIEW

The circuit court granted summary judgment in favor of Foghorn, and Foghorn appeals from the Court of Special Appeals' reversal of that grant of summary judgment. A court may grant summary judgment in favor of the moving party "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f).

> The question of whether a trial court's grant of summary judgment was proper is a question of law subject to *de novo* review on appeal. In reviewing a grant of summary judgment under [Maryland] Rule 2-501, we independently review the record to determine whether the parties properly generated a dispute of material fact, and, if not, whether the moving party is entitled to judgment as a matter of law. We review the record in the light most favorable to the nonmoving party and construe any reasonable inferences that may be drawn from the facts against the moving party.

*Boland v. Boland*, 423 Md. 296, 366 (2011) (quoting *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 479 (2007)).

Here, the material facts are not in dispute—the parties do not contest that Mr. Hosford possessed marijuana, and Mr. Hosford has not appealed from the circuit court's ruling that such possession was illegal activity in breach of the terms of his lease with Foghorn. Instead, the sole issue before this Court is the purely legal issue of whether a trial court could properly find that Mr. Hosford's breach was "substantial and warrants eviction" pursuant to RP § 8-402.1(b)(1), or whether that statute is preempted by federal law and

17

regulations governing lease provisions in federally-subsidized housing.  Like all questions of law, we shall review that issue without deference to the conclusions of the trial court, or the Court of Special Appeals.

**III.**
**DISCUSSION**

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398 (2012).  The existence of two sovereigns allows for "the possibility that laws can be in conflict or at cross-purposes." *Id.* at 398-99.  The Supremacy Clause was adopted with such conflicts in mind, and provides that federal law "shall be the supreme law of the land; and the Judges in every State shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. Art. VI, § 2.

Nevertheless, the Supreme Court has noted that "[t]his relatively clear and simple mandate has generated considerable discussion in cases where [courts] have had to discern whether Congress has pre-empted state action in a particular area." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 540-41 (2001).  Indeed, courts have determined that there are at least three instances in which state laws are preempted: express, field, and conflict preemption.  First, "[w]here Congress has expressly stated its intent to preempt state law, federal law prevails" (express preemption).  *Wells v. Chevy Chase Bank, F.S.B.*, 377 Md. 197, 209-10 (2003); *see also Arizona v. United States*, 567 U.S. at 399 ("[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper

18

authority, has determined must be regulated by its exclusive governance."). Second, preemption occurs "even where Congress has not expressly stated its intention in that regard, if there is evidence of Congress' intent to occupy a given field, and the state law falls within that field" (field preemption). *Wells*, 377 Md. at 210 (citations and internal quotation marks omitted); *see also Arizona v. United States*, 567 U.S. at 399 ("The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it'" or where there is a "'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Third, "state laws are preempted when they conflict with federal law" (conflict preemption). *Arizona v. United States*, 567 U.S. at 399; *see also*, *United Food & Comm. Workers Int'l Union, et al. v. Wal-Mart Stores, Inc., et al.*, --- Md. ---, No. 42, Sept. Term 2016 (June 22, 2017). Conflict preemption "includes cases where compliance with both federal and state regulations is a physical impossibility," as well as "those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]" *Arizona v. United States*, 567 U.S. at 399 (citations and internal quotation marks omitted).

In this case, the Court of Special Appeals stated that "[t]he parties agree, as do we, that the concepts of express and field preemption are not applicable to this case." *Hosford*, 229 Md. App. at 512. We agree with our brethren on the intermediate appellate court; the parties do not raise the issue of express or field preemption in this appeal, and we discern no congressional intent to expressly preempt state landlord-tenant law for federally-

19

subsidized housing or to occupy the entire field of landlord-tenant law as to federally-subsidized housing. Nor does Foghorn claim that it is impossible to comply with both the state and federal law at issue. Consequently, we shall limit our discussion to whether RP § 8-402.1 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and therefore must be deemed to be preempted under the doctrine of conflict preemption.

In conflict preemption, as in all preemption cases, "[t]he purpose of Congress is the ultimate touchstone[.]" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963)). Congress' intent "primarily is discerned" by examining the language of the federal statute(s) that allegedly preempt the state law as well as the "statutory framework" surrounding the federal statute(s). *Id.* at 486 (citations and internal quotation marks omitted). But, courts should also consider the "structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Id.* (citations and internal quotation marks omitted).

In addition to federal statutes, "an agency regulation with the force of law can pre-empt conflicting state requirements." *Wyeth v. Levine*, 555 U.S. 555, 576 (2009). However, when assessing the preemptive effect of federal regulations, courts perform their "own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption." *Id.* Furthermore, as the Court of Special Appeals

20

noted in its discussion of preemption, "[f]ederal agencies sometimes express views regarding preemption questions in ways that lack the formality of regulations, e.g., by compliance handbooks, other guidance materials, and commentaries on regulations." *Hosford*, 229 Md. App. at 511. In such instances, "courts have afforded some weight to the agency's explanation of its view, but no weight to its conclusion[.]" *Id.* As the Supreme Court explained in *Wyeth*,

> In prior cases, we have given some weight to an agency's views about the impact of [state] tort law on federal objectives when the subject matter is technica[l] and the relevant history and background are complex and extensive. Even in such cases, however, we have not deferred to an agency's *conclusion* that state law is pre-empted. Rather, we have attended to an agency's explanation of how state law affects the regulatory scheme. While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The weight we accord the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness.

555 U.S. at 576-77 (emphasis and second alteration in original) (citations and internal quotation marks omitted).

However, when assessing congressional intent and weighing whether a state law poses an obstacle to congressional purposes or objectives, courts must also apply a presumption that Congress did not intend to preempt state law. As the Supreme Court has explained, "because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic*, 518 U.S. at 485. Thus, "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in [a] field which the States have traditionally occupied,'

21

[courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice*, 331 U.S. at 230); *see also Bd. of Trs. of Emps.' Ret. Sys. of City of Balt. v. Mayor & City Council of Balt. City*, 317 Md. 72, 116 (1989) (noting that "in areas traditionally regulated by state and local governments, there is a strong presumption against finding federal preemption").

Thus, due to the presumption against preemption, "[t]he mere fact of 'tension' between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006). Indeed, the Supreme Court has held that "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth*, 555 U.S. at 575 (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989)).

Although the presumption against preemption is well-established, and plainly carries heightened force in instances where the state law at issue is in a field traditionally occupied by the states, some courts have suggested the presumption imposes an even higher bar against preemption. In *Hillman v. Maretta*, the Supreme Court held that "[t]he regulation of domestic relations is traditionally the domain of state law[,]" and that therefore there is a presumption against preemption of state statutes regulating domestic relations and marital property. 133 S. Ct. at 1950. And the Supreme Court held that under

22

that presumption, the state law "must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law will be overridden[.]" *Id.* (quoting *Hisquierdo*, 439 U.S. at 581). The Court of Special Appeals applied that standard in its conflict preemption analysis in the instant case. *Hosford*, 229 Md. App. at 512, 529.

Although several courts have applied the major damage standard in a conflict preemption analysis to state laws not involving marriage and marital property,[17] other courts appear to restrict the standard solely to conflicts involving state laws governing domestic relations.[18] To date, the Supreme Court has not applied the standard in a case

---

[17] *See e.g., In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 110-11 (2d Cir. 2016) (discussing the "major damage" standard as "strongest when Congress is legislating in an area recognized as traditionally one of state law alone" but concluding that bankruptcy was not such an area); *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1050 (7th Cir. 2013) (applying "major damage" standard to review whether state law restricting automated "robocalls" was preempted by federal telecommunications statute); *Mass. Ass'n of Private Career Sch. v. Healey*, 159 F. Supp. 3d 173, 218 (D. Mass. 2016) (applying "major damage" standard to review whether state statute restricting telemarketing was preempted by federal telecommunications statute); *Kennedy Tank & Mfg. Co. v. Emmert Indus. Corp.*, 67 N.E.3d 1025, 1029-30 (Ind. 2017) (applying "major damage" standard to determine whether Indiana state ten-year statute of limitations for actions by carriers for breach of contract was preempted by federal Interstate Commerce Commission Termination Act's eighteen–month statute of limitations for actions by carriers); *West v. Seattle Port Comm'n*, 380 P.3d 82, 87-88 (Wash. Ct. App. 2016) (applying "major damage" standard to review whether state statute requiring that all meetings of a governing body of a public agency be open to the public was preempted by Federal Shipping Act of 1984 as to meetings by ports agency).

[18] *See, e.g., Guardianship of O.D. v. Dillard*, 177 So.3d 175, 186 (Miss. 2015), *reh'g denied* (Nov. 12, 2015) (holding that the "major damage" standard applies to a preemption analysis of state domestic relations law); *In re Marriage of Herald & Steadman*, 322 P.3d 546, 553 (Or. 2014) (same); *Smith v. McIntosh*, 70 So.3d 1277, 1280 (Ala. Civ. App. 2011) (same); *Biondo v. Biondo*, 809 N.W.2d 397, 399-400 (Mich. Ct. App. 2011) (same).

that did not involve a conflict between federal law and state domestic relations law. As the Supreme Court has yet to clarify whether the "major damage" standard applies in a conflict preemption analysis as to *all* state laws in areas of traditional state law regulation, or is limited solely to state laws regulating marriage and marital property, we decline to adopt that standard at this time. Instead, we shall apply the well-established presumption against a judicial finding of conflict preemption, recognizing that the presumption holds the greatest weight for state laws that are in areas traditionally regulated by the states.

### A. *State Landlord-Tenant Law and the Presumption Against Federal Preemption*

Foghorn contends that the Court of Special Appeals erred in holding that landlord-tenant law was an area within the traditional domain of state courts and, consequently, erred in holding that a heightened presumption against federal preemption applied in this case. Foghorn maintains that the Court of Special Appeals improperly relied upon what Foghorn characterizes as *dicta* in *Perry v. Housing Authority of City of Charleston*, 664 F.2d 1210, 1216 (4th Cir. 1981) ("It would be hard to find an area of the law in which the states have a greater interest or have had greater involvement than in the legal area of landlord-tenant.") and *Forest City Residential Management, Inc. ex rel. Plymouth Square Ltd. Dividend Housing Ass'n v. Beasley*, 71 F. Supp. 3d 715, 732 (E.D. Mich. 2014) ("[S]tate courts have jurisdiction to determine whether, and under what circumstances, a landlord may evict a tenant for violation of lease provisions."). Moreover, Foghorn insists that the Court of Special Appeals' conclusion that landlord-tenant law is a traditional state law area "fails to take into account" both "the unique facts of the instant case" and recent developments in federal law and regulations. In contrast, Mr. Hosford contends that the

24

Court of Special Appeals was correct in holding that landlord-tenant law is a traditional state law area and, therefore, that the intermediate appellate court did not err in applying the presumption against preemption.

The origins of American landlord-tenant law, a subset of property law, can be traced back to the common law of England. *See Brown*, 350 Md. at 577-79 (discussing the origins of an action for ejectment in English common law); *see also* Robert S. Schoshinski, American Law of Landlord and Tenant § 1:1, 1-2 n.2 (1980); Douglas M. Bregman, Maryland Landlord-Tenant Law: Practice and Procedure § 1.01-1.04, 1-10 (Matthew Bender 4th ed. 2010, 2016 Supp.). That common law was imported to the American colonies, and was retained and further developed by the states following the Revolution. Bregman, Maryland Landlord-Tenant Law: Practice and Procedure § 1.05, 10-13. Throughout the eighteenth and nineteenth centuries, landlord-tenant law was primarily a creature of contract and the common law overseen by state or local courts. *Id.* In more recent decades, state legislatures have enacted statutes that have greatly expanded tenant rights and protections while limiting the power of landlords. *See, e.g.*, Mary Ann Glendon, *The Transformation of American Landlord-Tenant Law*, 23 B.C. L. Rev. 503 (1982); Edward H. Rabin, *The Revolution in Residential Landlord-Tenant Law: Causes and Consequences*, 69 Cornell L. Rev. 517 (1984). Thus, it is clear that landlord-tenant law has historically been principally within the domain of the states.

Furthermore, in addition to the two cases relied upon by the Court of Special Appeals,[19] numerous courts have recognized that landlord-tenant law is an area traditionally regulated by state and local governments, and one that has never been federalized. *See Lindsey v. Normet*, 405 U.S. 56, 68 (1972) (holding that "[t]he Constitution has not federalized the substantive law of landlord-tenant relations"); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982) (noting that "[t]his Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular"); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 565-66 (5th Cir. 2013) (concluding that local housing regulation was within traditional police power of local jurisdictions); *Powers v. U.S. Postal Serv.*, 671 F.2d 1041, 1045 (7th Cir. 1982) (recognizing that "a federal common law of landlord and tenant does not exist"); *Hous. & Redevelopment Auth. of Duluth v. Lee*, 832 N.W.2d 868, 873 (Minn. Ct. App. 2013) (holding that "regulation of landlord-tenant relations is a traditional area of state concern"), *aff'd on other grounds*, 852

_____

[19] Contrary to Foghorn's assertions, the statements quoted and relied upon by the Court of Special Appeals in both of the two cases on which it relied are not *dicta*. "Obiter dictum" is typically a judicial comment "that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." Black's Law Dictionary (10th ed. 2014). The determination of whether landlord-tenant law was in a traditional state law area is necessary to the holding of both *Perry* and *Forest City*. *See Perry*, 664 F.2d 1215-16 (concluding that landlord-tenant law is an area in which states have great interest and involvement as necessary to the court's determination of whether a party had met one of the factors in the test stated in *Cort v. Ash*, 422 U.S. 66, 78 (1975) for when a federal right of action exists under a federal statute); *Forest City*, 71 F. Supp. 3d 731-32 (concluding that state courts have jurisdiction over whether to evict a tenant as necessary to the court's holding that it would not exercise jurisdiction over a plaintiff's claim seeking a declaratory holding as to whether it could evict a tenant). Thus, while both cases are persuasive authority only, their respective statements of law are not *dicta*.

26

N.W.2d 683 (Minn. 2014); *Rosario v. Diagonal Realty*, LLC, 872 N.E.2d 860, 865 (N.Y. 2007) (holding same); *Kadera v. Superior Court In & For Cty. of Maricopa*, 931 P.2d 1067, 1071 (Ariz. Ct. App. 1996) (holding similarly); *Rowe v. Pierce*, 622 F. Supp. 1030, 1033 (D.D.C. 1985) (holding similarly); *Troupe v. Fairview Apartments*, 464 F. Supp. 234, 235 (E.D. Tenn. 1979) (holding similarly).

Finally, as to Foghorn's claims that the Court of Special Appeals failed to consider the facts of this particular case or recent developments in federal law, such considerations are irrelevant to deciding whether the presumption against preemption applies. In *Wyeth*, the petitioner, a drug manufacturer, argued "that the presumption against pre-emption should not apply . . . because the Federal Government has regulated drug labeling for more than a century." 555 U.S. at 565 n.3. The Supreme Court rejected that argument, stating that the petitioner "misunderstands the principle" behind the presumption against preemption. The Court clarified that the presumption "accounts for the historic presence of state law but does not rely on the absence of federal regulation." *Id.* Here, the recent developments in federal law or facts specific to this case do not affect the "historic presence of state law" in the area of landlord-tenant relations, and thus do not affect the application of the presumption.

Therefore, we hold that the Court of Special Appeals correctly concluded that landlord-tenant law is in the traditional domain of state law and, consequently, correctly applied a heightened presumption against federal preemption.

### B. RP § 8-402.1 Conflict Preemption Analysis

Applying the presumption against preemption and other principles of conflict preemption discussed above, we must consider whether the requirement in RP § 8-402.1(b)(1) that a court in an eviction action must determine that a tenant's breach of lease was "substantial and warrants an eviction" before awarding possession to a landlord conflicts with, and is thus preempted by, federal statutory and regulatory requirements governing federally-subsidized Section 8 project-based housing.

#### 1. RP § 8-402.1

RP § 8-402.1 "is the most recent of a trilogy of statutes providing landlords an expedited remedy for the recovery of leased premises." *Brown*, 350 Md. at 576. The first of that trilogy, RP § 8-401, "permits a landlord to recover possession of leased premises whenever the tenant fails to pay rent that is currently due and payable." *Id.* The second, RP § 8-402, "deals with tenants holding over after termination of the lease" and permits a landlord to recover both possession and damages. *Id.* at 577. The eviction proceedings under both statutes are expedited and summary in nature—in order to secure a judgment in his favor, a landlord need prove only nonpayment of any amount of rent under § 8-401, or a tenant holding over after the expiration of a lease and proper notice to quit under § 8-402. *Id.* at 576-77.

In contrast, RP § 8-402.1 provides a different procedure "for recovery of the premises when the tenant has breached a covenant of the lease, other than the covenant to pay rent that is currently due." *Id.* at 577. In *Brown*, we traced the evolution of that provision, starting from common law remedies through the enactment of the three summary

eviction statutes. *Id.* at 577-84. We explained that prior to RP § 8-402.1, a landlord faced with a breach of lease other than nonpayment of rent or holding over could pursue an action for breach of contract or a common law action in ejectment. *Id.* at 582. But, in a common law action for ejectment, a tenant could move to stay the eviction under equitable considerations. *Id.* at 582-83. In order to avoid that prospect, landlords began pursuing the summary eviction process under RP § 8-402 for breaches other than nonpayment of rent. *Id.* at 583. We stated in *Brown* that "[t]he General Assembly was not content to have the practice of using § 8-402 continued, but neither did it intend to leave landlords only to the common law action of ejectment." *Id.* at 584.

Consequently, the General Assembly included in RP § 8-402.1 the language that is the focus of the instant appeal, found in subsection (b)(1) of the statute, which states in pertinent part:

> If the court determines that the tenant breached the terms of the lease *and that the breach was substantial and warrants an eviction*, the court shall give judgment for the restitution of the possession . . . .

(Emphasis added.) The highlighted language mandates that a court weigh equitable factors before evicting a tenant and granting possession to a landlord.[20] Those factors may include "the actual loss or damage caused by the violation at issue, the likelihood of future

---

[20] We noted in *Brown* that the language in RP § 8-402.1 "was necessarily fashioned in the light of . . . the long-standing principle that forfeitures for breach of covenant were not a matter of right but were subject to the intervention of equity when regarded as unfair or inappropriate." 350 Md. at 584. And, we stated that "[t]he inclusion of the phrase in question, conditioning a forfeiture on a finding that the breach in question warranted that relief, is in perfect harmony with those considerations[.]" *Id.*

violations, and the existence of effective alternative remedies for past or existing violations." *Id.*

### 2. *Federal Housing Programs and "Section 8" Housing*

The federal government made its first major foray into public housing in 1937 with the enactment of the Housing Act, also known as the Wagner-Steagall Act. Pub. L. No. 75-412, 50 Stat. 888 (1937). Congress passed the Act in order to,

> assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation.

*Id.* at 50 Stat. 888, 896; *see also*, Roberta L. Rubin, *Public Housing Development—Mixed Finance in the Context of Historical Trends*, *in* Navigating HUD Programs, A Practitioners' Guide to the Labyrinth 232-34 (George Weidenfeller & Julie McGovern, eds. 2012) (discussing the purpose of the Housing Act). While there have been numerous amendments and policy shifts to the 1937 Housing Act over the decades since its enactment, the underlying purpose of the Act to provide "decent, safe, and sanitary" housing for low-income Americans has remained the same. And, as one commentator has described, "[i]n the years since the creation of the [federal] public housing program, successive waves of reform have shifted the vision underlying the creation of new public housing[,]" but "[t]he basic structure . . . as a program in which the federal government finances development and ownership of housing by state and local agencies [has] remained

30

largely constant[.]" Rubin, *supra* at 234.[21] In 1965, Congress amended the Housing Act and merged all federal housing agencies into the Department of Housing & Urban Development ("HUD"). *See* Department of Housing & Urban Development Act, Pub. L. No. 89-174, 79 Stat. 667 (1965). HUD remains the federal agency overseeing federal housing programs today.

The current structure for federally-subsidized housing programs stems primarily from the Housing and Community Development Act ("HDCA"), Pub. L. 93-383, 88 Stat. 633 (1974), *codified at* 42 U.S.C. § 1437f. The HDCA amended Section 8 of the original 1937 Housing Act into what has become known as the "Section 8 housing" program. Section 8 housing is divided into two major categories: the tenant-based program and the project-based program. *See* 42 U.S.C. §§ 1437f(b)(2), 1437f(e)(1); *see also* Michael A. Reardon and Tatiana Gutierrez Abendschein, *The Section 8 Housing Assistance Program*, *in* Navigating HUD Programs, A Practitioners' Guide to the Labyrinth, 319-25. In both programs, tenants pay thirty percent of their adjusted income, and the Section 8 program pays the difference between the tenant payment and the rent, up to a certain monthly amount. Reardon and Abendschein, *supra* at 326. In the instant case, Ruscombe Gardens

---

[21] For a thorough discussion of the evolution of the development of federal public housing programs *see* Rubin, *supra* at 234-81. In the 1990s, significant changes were made to the public housing system that permitted state and local public housing authorities to participate in developing "mixed-finance projects" assisted in part by private-sector sources. *Id.* at 246-47. However, those changes did not fundamentally alter the structure of the system as one with significant federal funding but with housing projects overseen and directed by state and local agencies.

Apartments receives such federally-subsidized payments directly through the project-based Section 8 housing program.

In 1988, Congress amended the Housing Act by enacting the Anti-Drug Abuse Act ("ADAA") of 1988. Pub L. No. 100-690, 102 Stat. 4181 (1988). The subchapter of the ADAA pertaining to public housing projects, entitled the Public Housing Drug Elimination Act of 1988, contained the following findings of Congress:

The Congress finds that—

(1) the Federal Government has a duty to provide public housing that is decent, safe, and free from illegal drugs;

(2) public housing projects in many areas suffer from rampant drug-related crime;

(3) drug dealers are increasingly imposing a reign of terror on public housing tenants;

(4) the increase in drug-related crime not only leads to murders, muggings, and other forms of violence against tenants, but also to a deterioration of the physical environment that requires substantial governmental expenditures; and

(5) local law enforcement authorities often lack the resources to deal with the drug problem in public housing, particularly in light of the recent reductions in Federal aid to cities.

102 Stat. 4295, 4301 (1988). Accordingly, Congress revised 42 U.S.C. § 1437d to include the following provision,

Each public housing agency shall utilize leases which—

* * *

provide that . . . any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's

> household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy[.]

42 U.S.C. § 1437d(l)(6); *see also* 102 Stat. at 4300.

In 2002, the Supreme Court had cause to interpret the provisions of 42 U.S.C. § 1437d(l)(6) in *Department of Housing & Urban Development v. Rucker*, 535 U.S. 125 (2002). In that case, a local public housing authority initiated eviction proceedings against four tenants in state court based upon breaches of the mandatory lease provision in those tenants' leases by members of the tenants' households or by their guests. *Id.* at 128. The tenants challenged HUD regulations implementing the provision, contending, among other claims, that the statute did not require the eviction of "innocent" tenants who did not know, or have reason to know, of the drug-related criminal activity of household members or guests. *Id.* at 129.

The Supreme Court rejected that claim, and held that "42 U.S.C. § 1437d(l)(6) unambiguously requires lease terms that vest local public housing authorities with the discretion to evict tenants for the drug-related activity of household members and guests whether or not the tenant knew, or should have known, about the activity." *Id.* at 130. However, the Supreme Court emphasized that "[t]he statute does not *require* the eviction of any tenant who violated the lease provision[,]" but rather "entrusts that decision to the local public housing authorities, who are in the best position to take account of, among other things, the degree to which the housing project suffers from rampant drug-related or violent crime, the seriousness of the offending action, and the extent to which the

33

leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action[.]"

*Id.* at 133-34 (citations and internal quotation marks omitted).

> 3. *Federal Housing Program Provisions at Issue in the Instant Case*

The changes made by Congress in the ADAA to 42 U.S.C. § 1437d apply only to traditional public housing programs and do not apply to Section 8 project-based housing programs such as Ruscombe Gardens. However, in 1998, Congress passed the Quality Housing and Work Responsibility Act (the "QHWRA"), which extended a substantively similar statutory requirement to Section 8 programs like Ruscombe Gardens. *See* Pub. L. No. 105-276, title v, 112 Stat. 2461, 2518 (1998). The new requirement revised 42 U.S.C. § 1437f to include, in pertinent part, the following provision,

> Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that—
>
> * * *
>
> (B)    (i) the lease between the tenant and the owner shall be for at least one year or the term of such contract, whichever is shorter, and shall contain other terms and conditions specified by the Secretary;
>
> (ii) during the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause;
>
> **(iii) during the term of the lease . . . any drug-related criminal activity on or near such premises, engaged in by a tenant of any unit, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy[.]**
>
> * * *

34

42 U.S.C. § 1437f(d)(1) (emphasis added). The congressional findings for the QHWRA did not explain why Congress amended 42 U.S.C. § 1437f to add the mandatory lease provision. *See* 112 Stat. 2520-21. Therefore, we shall read the provision in light of the congressional findings for the earlier version of the provision now contained in 42 U.S.C. § 1437d(l)(6), as well as the Supreme Court's interpretation of that provision in *Rucker*, 535 U.S. 125.

Also relevant are HUD regulations that govern the termination and eviction of tenants in Section 8 project-based housing. 24 C.F.R. § 880.607 is the general regulation controlling termination of tenancy for Section 8 project-based housing programs. That regulation provides that a landlord may not terminate a tenancy except for certain specified grounds, which include "[m]aterial noncompliance with the lease" and "[c]riminal activity by a covered person[,]" such as the drug-related criminal activity addressed in 42 U.S.C. § 1437f(d)(1)(B)(iii) and its other implementing regulations. However, it also clearly states that "[a]ll terminations **must also be in accordance with the provisions of any State and local landlord tenant law**[.]" 24 C.F.R. § 880.607(b)(1)(iv) (emphasis added).

The implementing regulations for the mandatory lease provision in 42 U.S.C. § 1437f(d)(1)(B)(iii) are found at 24 C.F.R. §§ 5.850 *et seq*. 24 C.F.R § 5.851(b) authorizes landlords to terminate leases in accordance with the standards set in §§ 5.850 *et seq.*, but only "in accordance with your leases **and landlord-tenant law** . . . ." 24 C.F.R § 5.852(a) describes a landlord's discretion in screening and evicting tenants and provides, in pertinent part,

35

(a) General.  If the law and regulation permit you to take an action but do not require action to be taken, you may take or not take the action in accordance with your standards for admission and eviction.  Consistent with the application of your admission and eviction standards, you may consider all of the circumstances relevant to a particular admission or eviction case, such as:

(1) The seriousness of the offending action;

(2) The effect on the community of denial or termination or the failure of the responsible entity to take such action;

(3) The extent of participation by the leaseholder in the offending action;

(4) The effect of denial of admission or termination of tenancy on household members not involved in the offending action;

(5) The demand for assisted housing by families who will adhere to lease responsibilities;

(6) The extent to which the leaseholder has shown personal responsibility and taken all reasonable steps to prevent or mitigate the offending action; and

(7) The effect of the responsible entity's action on the integrity of the program.

24. C.F.R. § 5.858 implements the mandatory lease requirement stated in 42 U.S.C. § 1437f

as to drug-related criminal activity, and provides,

The lease must provide that drug-related criminal activity engaged in on or near the premises by any tenant, household member, or guest, and any such activity engaged in on the premises by any other person under the tenant's control, is grounds for you to terminate tenancy.  In addition, the lease must allow you to evict a family when you determine that a household member is illegally using a drug or when you determine that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents.

36

Finally, 24 C.F.R. § 5.861 describes a landlord's discretion to evict for criminal activity even in the absence of a conviction, and provides,

> You may terminate tenancy and evict the tenant **through judicial action** for criminal activity by a covered person in accordance with this subpart if you determine that the covered person has engaged in the criminal activity, regardless of whether the covered person has been arrested or convicted for such activity and without satisfying a criminal conviction standard of proof of the activity.

(Emphasis added.)

#### 4. Congressional Intent Behind the Federal Provisions at Issue and Whether RP § 8 402.1(b)(1) is an Obstacle to That Intent

Foghorn claims that Congress' broad goal in enacting 42 U.S.C. § 1437f(d)(1)(B)(iii) was to "**achieve** federally assisted low-income housing that is decent, safe[,] and free from illegal drugs." (Emphasis added.) Foghorn also maintains that "Congress' [specific] method of achieving its goal" was to authorize "**housing providers to evict** tenants who engage in drug-related criminal activity." (Emphasis added.)

Foghorn further contends that RP § 8-402.1(b)(1) is an obstacle to the accomplishment and execution of the Congressional intent to achieve drug-free housing because Maryland courts might "allow[ ] a tenant to continue to reside in [his] subsidized housing unit after committing a drug-crime on a purely equitable basis[.]" According to Foghorn, that would reduce the incentive of tenants not to use illegal drugs, counter to the Congressional intent to remedy drug-related crime, and would "threaten[ ] the integrity of the entire housing project and the rights of all tenants residing therein."

Foghorn also contends that RP § 8-402.1(b)(1) undermines the discretion afforded to landlords. Foghorn maintains that the "only role of [a] state court in federally-subsidized

37

housing evictions concerning drug-related criminal activity is whether the grounds for eviction relied upon by the housing provider actually exist." Foghorn thus insists that "any other or additional inquiry by [a] state court inevitably acts to limit the housing provider from exercising its Congressionally-founded discretion, and would [thus] be preempted by federal law."

Mr. Hosford responds that Foghorn has misstated Congress' intent behind the federal statute and regulations at issue. According to Mr. Hosford, Congress intended to vest landlords with the discretion to decide whether a breach in a particular case "either justified maintaining a family in its housing or initiating a termination action." And Mr. Hosford contends that rather than standing as an obstacle to federal law, RP § 8-402.1(b)(1) "work[s] in concert" with federal law.

Initially, we disagree with Foghorn's statements of the congressional intent behind the mandate in 42 U.S.C. § 1437f(d)(1)(B)(iii) that all Section 8 project-based housing must include lease provisions providing that "any drug-related criminal activity on or near [the project] premises, engaged in by a tenant of any unit, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy." Our examination of the relevant statutes, regulations, and the Supreme Court's holding in *Rucker* leads to the following conclusions regarding the congressional intent behind that mandatory lease provision. First, Congress' broad intent was to reduce drug-related crime in federal-subsidized housing that threatens resident safety and causes deterioration of the condition of housing that requires significant government expenditures. This is clear from the congressional findings that accompanied

38

the enactment of the ADAA and the original mandatory lease provision statute in 42 U.S.C. § 1437d(l)(6). *See* Anti-Drug Abuse Act, 102 Stat. 4295, 4301 (1988) (describing Congressional findings behind the ADAA, including "(2) public housing projects in many areas suffer from rampant drug-related crime; (3) drug dealers are increasingly imposing a reign of terror on public housing tenants; (4) the increase in drug-related crime not only leads to murders, muggings, and other forms of violence against tenants, but also to a deterioration of the physical environment that requires substantial governmental expenditures").[22]

In those findings, Congress also stated that "the Federal Government has a duty to provide public housing that is decent, safe, and free from illegal drugs." *Id.* However, it is clear that Congress recognized that "duty" was an aspirational one. Congress described "rampant drug-related crime" and a "reign of terror" imposed by drug dealers in public housing projects, and noted that there had been substantial reductions in federal aid to cities to address drug-related crime. *Id.* Congress could not have expected the mandatory lease provision to resolve such entrenched problems.

Moreover, Congress declined to mandate an absolute, zero-tolerance policy for **all** drug-related criminal conduct in public housing or federally-subsidized housing. Congress has required the eviction of tenants in public housing under other circumstances—for

---

[22] That Congress' broad intent was to reduce drug-related crime is also consistent with the original goal of the Housing Act, to "remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation." Pub. L. No. 75-412, 50 Stat. 888, 896 (1937).

instance, 42 U.S.C. § 1437n(f)(2) requires that a public housing agency "immediately and permanently terminate the tenancy" of anyone convicted of manufacturing or producing methamphetamines on the premises. However, neither the original ADAA as enacted in 42 U.S.C. § 1437d nor the addition of a similar provision for Section 8 housing in 42 U.S.C. § 1437f mandated the eviction of tenants for any possession of illegal drugs or other drug-related criminal activity.

Thus, contrary to Foghorn's assertions, in enacting the ADAA and later expanding it to Section 8 housing, Congress recognized that drug-related criminal activity was a long-term, systemic problem, and did not intend to "achieve" housing that was entirely free from illegal drugs.[23] Rather, Congress intended to **reduce** drug-related crime in public housing projects and federally-subsidized housing, particularly drug-related crime that threatened resident safety or the maintenance of housing facilities.

The second clearly discernable intent of Congress in enacting 42 U.S.C. § 1437f(d)(1)(B)(iii), was a more specific one, namely, to vest landlords with significant discretion to bring an eviction action against tenants for any drug-related criminal conduct in order to effectuate its broader aim. Congress clearly stated that a landlord could bring an eviction action for drug-related criminal activity "on or near" the rented premises, and

---

[23] Indeed, in light of the prevalence of illegal drugs and drug-related criminal activity in modern American life, it would be absurd to conclude that Congress intended to "achieve" a drug-free housing environment solely from the inclusion of a mandatory lease provision in public housing lease agreements, without providing additional resources for police or other governmental bodies to tackle drug-related criminal activity directly. We must reject such an absurd interpretation of the federal statute. *See Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 550 (2002) (noting that "absurd results in the interpretive analysis of a statute are to be shunned").

40

whether by the tenant, "any member of the tenant's household, or any guest or other person under the tenant's control[.]" *Id.* And, as clarified in HUD regulations, a landlord could bring such an eviction action even in the absence of a criminal conviction, and without needing to meet the standards of proof required in criminal cases. *See* 24 C.F.R. § 5.861. The Supreme Court has emphasized that a landlord is generally in "the best position to take account of, among other things, the degree to which the housing project suffers from rampant drug-related or violent crime, the seriousness of the offending action, and the extent to which the leaseholder has . . . taken all reasonable steps to prevent or mitigate the offending action[.]" *Rucker*, 535 U.S. at 134 (citations and internal quotation marks omitted); *see also* 24 C.F.R § 5.852 (listing factors that a landlord "may" consider in determining whether or not to evict for drug-related criminal activity).

However, it is also clear, at least for Section 8 project-based housing programs, that Congress intended that landlords would act to evict **solely** by bringing an eviction action in state or local courts, subject to the provisions of state landlord-tenant law. 42 U.S.C. § 1437f(d)(1)(B)(iii) does not directly specify how evictions are to be carried out, referring only to "termination of tenancy." But HUD regulations subsequently clarified the meaning of that statutory provision. 24 § C.F.R. 880.607, the general regulation controlling termination of tenancy for Section 8 project-based housing programs, clearly states that "[a]ll terminations must also **be in accordance with the provisions of any State and local landlord tenant law**." (Emphasis added.) The implementing regulations for 42 U.S.C. § 1437f(d)(1)(B)(iii) similarly state that evictions must be in accordance with state landlord-

tenant law. *See* 24 C.F.R § 5.851(b).[24]  And, 24 C.F.R. 5.861 clarifies that a landlord may only move to terminate tenancy and evict "**through judicial action**" for drug-related criminal activity by a tenant, household member, or guest.  (Emphasis added.)

Thus, Foghorn is incorrect when it contends that "Congress' [specific] method of achieving its goal" was to authorize "housing providers **to evict** tenants who engage in drug-related criminal activity."  Rather, Congress intended that housing providers in Section 8 project-based housing programs would have substantial discretion **to bring an eviction action** for any drug-related criminal activity.  And Congress intended that such an eviction action would proceed in accordance with state landlord-tenant law provisions and procedures.

RP § 8-402.1(b)(1) does not pose an obstacle to either the broad or specific congressional intent behind the mandatory lease provisions at issue.  A Maryland court applying RP § 8-402.1(b)(1) may determine that an individual instance of drug possession by a tenant in federally-subsidized housing is not a "substantial" breach of the mandatory lease provision, or does not "warrant eviction."  However, as described above, Congress did not intend to mandate that every instance of drug possession must result in eviction, without any consideration of equitable factors.  *See Rucker*, 535 U.S. at 133-34 (noting that the mandatory lease provision statute at issue in that case "does not *require* the eviction of

---

[24] 24 C.F.R § 5.851(b) states that landlords may act to evict under the lease terms mandated in 42 U.S.C. § 1437f "in accordance with . . . landlord-tenant law . . . ."  Although the regulation does not directly provide that evictions must be made in accordance with *state* landlord-tenant law, as we have previously discussed, there is no federal common law or statutory provisions regulating landlord-tenant relations—landlord-tenant law is purely a creature of state and local law.

any tenant who violated the lease provision" (emphasis in original)). Indeed, as previously noted, one of the enabling regulations for 42 U.S.C. § 1437f(d)(1)(B)(iii) includes a list of equitable considerations for a landlord to consider when choosing whether or not to bring an eviction action. *See* 24 C.F.R. § 5.852. Those factors include equitable considerations such as "[t]he seriousness of the offending action" and "[t]he extent to which the leaseholder has shown personal responsibility and taken all reasonable steps to prevent or mitigate the offending action[.]" *Id.*

Furthermore, as shown in the congressional findings discussed above, Congress was most concerned about drug-related criminal activity that threatened the health or safety of residents, or threatened to do significant damage to housing properties. The judicial review mandated in RP § 8-402.1(b)(1) will not conflict with those core congressional concerns: If the illegal conduct of a tenant, household member, or guest in federally-subsidized housing involves a violent drug-related crime, or the distribution of drugs from a rental unit, or significant property damage caused by drug-related activity, such conduct would surely be both "substantial" and "warrant eviction." We agree with the view expressed by our intermediate appellate court brethren that Maryland trial courts are entirely capable of balancing equitable considerations that may merit leniency against the need to protect the safety of others in the housing project and the integrity of the housing project. *See Hosford*, 229 Md. at 529-30. Thus, we do not believe that the application of RP § 8-402.1(b)(1) will incentivize drug use, undermine the integrity of housing projects, or threaten the safety or rights of other tenants.

Nor do we agree with Foghorn that a trial court reviewing an eviction to determine whether it is "substantial" and "warrants eviction" undermines the discretion afforded to landlords under the federal provisions at issue. Foghorn apparently regards the mandatory lease provision in 42 U.S.C. § 1437f(d)(1)(B)(iii) as expressing a congressional intent that state courts must rubberstamp a landlord's decision to evict, so long as the court determines that the decision to evict was indeed based on some drug-related criminal activity. However, as noted above, while Congress clearly intended to afford landlords in Section 8 project-based housing substantial discretion to take action against tenants for any drug-related criminal activity, HUD regulations have clarified that Congress intended that action to occur solely by bringing an eviction action in state court **in accordance with state landlord-tenant law**. Applying the presumption against a finding of federal preemption, we conclude that Congress' intent that evictions would proceed in state court, applying state landlord-tenant law, is a strong indication that Congress did not intend to preempt that state law. As the Supreme Court emphasized in *Wyeth*, "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." 555 U.S. at 575 (quoting *Bonito Boats, Inc.*, 489 U.S. at 166-67).

Furthermore, RP § 8-402.1 does not limit a landlord's discretion to bring an eviction action in any way. Instead, once a landlord has exercised the discretion afforded by Congress and decided to move to evict, the statute ensures that the proposed eviction is subject to meaningful judicial review under equitable considerations that have long been

44

part of Maryland landlord-tenant law. *See Brown*, 350 Md. at 584. In other words, RP §

8-402.1(b)(1) adds a judicial "second look" as to whether equitable considerations merit

relief from eviction, but does not conflict with or obstruct Congress' intent that the initial

discretion as to whether to bring an eviction action lies solely with a landlord. In this

instance, the federal and state provisions thus work in harmony with one another. *See e.g.*,

*Rosario*, 872 N.E.2d at 865 (rejecting an argument that Section 8 housing law and federal

regulations preempted New York state law, and noting that in regulating federally-

subsidized housing, "federal and state law depend on each other; neither excludes the

other").

The Court of Special Appeals reached a similar conclusion that federal provisions

governing Section 8 housing can work in harmony with RP § 8-402.1 and other Maryland

landlord-tenant statutes providing for summary ejectment procedures in *Grady

Management, Inc. v. Epps*, 218 Md. App. 712 (2014). In *Epps*, a landlord in Section 8

project-based housing brought successive breach of lease actions against a tenant for

making loud noises and threatening other tenants. *Id.* at 716-19. The intermediate

appellate court determined that the lease at issue was subject to a federal requirement that

a landlord must show "good cause" to refuse to renew tenancy. *Id.* at 728-32. The landlord

in *Epps* contended that "'landlords are not held to the more stringent requirements

established by Maryland's breach of lease statute' when establishing good cause to

terminate or to not renew a lease at the end of a term." *Id.* at 732. The Court of Special

Appeals disagreed, holding that "[t]he requirement of [RP] § 8-402.1 that a claimed

'breach' must 'warrant[] an eviction' does not, in our view, impose on a landlord seeking

45

to terminate a project-based subsidized lease a 'more stringent' demonstration of good cause than is necessary." *Id.* at 734. Similarly, in this case, we conclude that RP § 8-402.1 does not impose a "more stringent" standard for a landlord to secure an eviction for a breach of lease due to drug-related criminal activity than that set forth in federal law and regulations—it merely subjects the landlord's discretionary decision to bring an eviction action to appropriate judicial review.

Foghorn relies upon the Supreme Court's holding in *Rucker* as support for his contention that Congress intended to vest landlords with effectively unreviewable discretion to evict. In *Rucker*, the Supreme Court stated that "42 U.S.C. § 1437d(l)(6) unambiguously requires lease terms *that vest local public housing authorities with the discretion to evict tenants* for the drug-related activity of household members and guests whether or not the tenant knew, or should have known, about the activity." 535 U.S. at 130 (emphasis added). However, the Supreme Court's emphasis on public housing authorities' discretion must be viewed in context—its holding was in response to a claim that the statute should be interpreted to mean that public housing authorities did not have the discretion to evict "innocent" tenants who did not directly participate in drug-related criminal activity. Whether the federal statute preempted state law or the discretion of state courts was not at issue, and was not addressed by the Supreme Court. Thus, *Rucker* does not stand for the proposition that Congress intended local public housing authorities have **absolute** discretion to evict tenants under 42 U.S.C. § 1437d(l)(6), and that a state court must merely rubberstamp the landlord's decision. Further, to the extent that *Rucker* may conflict with our holding today, we note that it involved an interpretation of 42 U.S.C. §

46

1437d governing public housing projects, and not § 1437f governing the type of Section 8 project-based housing that is at issue before us. The regulations discussed above specific to § 1437f clarify that, at least for that statute, a landlord must pursue an eviction in state court, and in accordance with state landlord-tenant law.

Foghorn also directs our attention to two agency guidance materials, which it asserts demonstrate an intent for the federal law to preempt state laws such as the disputed portions of RP § 8-402.1: HUD's Handbook 4350.3 and the preamble to 24 C.F.R. § 5.850 *et seq.* We accord "some weight" to these agency views, depending on their "thoroughness, consistency, and persuasiveness." *Wyeth*, 555 U.S. at 576-77. However, we do not defer to the agency's conclusion that state law is preempted. *Id.*

The Court of Special Appeals provided a thorough and cogent analysis as to each of the two guidance documents raised by Foghorn. The Court of Special Appeals first addressed HUD's Handbook 4350.3:

> Foghorn directs us to the section of the Handbook that discusses procedures for judicial actions to evict a tenant of federally-subsidized housing, which states:
>
> Judicial action.
>
>> a. An owner must not evict any tenant except by judicial action pursuant to state and local laws.
>>
>> * * *
>>
>> d. A tenant may rely on state or local laws governing eviction procedures where such laws provide the tenant procedural rights that are in addition to those provided by the regulatory agreements, except where such laws have been preempted under 24 C.F.R. Part 246, Local Rent Control, or by other action of the United States.

47

Handbook 4350.3 at [8-13.B.5]

Foghorn overlooks the seemingly clear language in subsection a. and the first clause in subsection d.  Focusing instead on the second clause in subsection d., Foghorn argues that HUD intended to preempt state laws that are incongruent with 42 U.S.C. § 1437f and 24 C.F.R. § 5.858 because subsection d. explicitly references the preemption of state laws.  However, . . . HUD's example of an "action of the United States" is 24 C.F.R. Part 246.  The introduction to that regulation describes the scope of Part 246:

> The regulation of rents for a project coming within the scope of 'Subpart B—Unsubsidized Insured Projects' is preempted under these regulations *only when the Department determines that the delay or decision of the local rent control board . . . jeopardizes the Department's economic interest* in a project covered by that subpart.  The regulation of rents for projects coming within the scope of 'Subpart C—Subsidized Insured Projects' *is preempted in its entirety by the promulgation of these regulations. . . .*

24 C.F.R. § 246.1(a) (emphasis added).

The preemption language in 24 C.F.R. § 246.1(a) is explicit.  It suggests to us that, when HUD used the term "other action of the United States" in Handbook 4350.3, the Department was referring to actions by the federal government that clearly and unmistakably indicate that state or local law is preempted.  Nothing in the Federal Housing Act explicitly preempts state and local landlord-tenant laws; and nothing in 24 C.F.R. § 5.850 *et seq.* expresses an explicit intent to preempt state or local laws concerning eviction procedures.

*Hosford*, 229 Md. App. at 519-20.

The intermediate appellate court then turned to the preamble to the regulation adopting 24 C.F.R. § 5.850 *et seq.*:

> The preamble is an introductory statement . . . , which contains information on the final rule such as a summary of the rule, the effective date of the rule, and other supplementary information on the rule.  66 Fed. Reg. 28776 (May 24, 2001).  What is of particular interest to us is a portion of the preamble to 24 C.F.R. § 5.850 and related regulations that discuss proposed

48

amendments to the regulations which were received by HUD during the public comment period. Foghorn places special significance on a portion of HUD's response to one comment, arguing that it reveals HUD's intent to sharply limit the role of state courts in eviction proceedings.

The commenter, a legal services organization, recommended that HUD modify its proposed regulations for lease provision requirements in order to:

> [P]reserv[e] for [public housing authorities] (*and add[] for courts*) 'discretion to consider all of the circumstances of the case, including the seriousness of the offense, the extent of participation by family members, and the effects that the eviction would have on family members not involved in the proscribed activity.'

*Id.* at 28782 (emphasis added).

In response, the Office wrote:

> . . .

> *The statute* does not authorize courts to exercise the same type of discretion. Courts determine whether a violation of the lease has occurred and whether the lease provides that such a violation is grounds for eviction of the persons whom the [public housing authority] seeks to evict. . . . [I]t is important to recognize that . . . a court's function *under HUD's regulations* is to determine whether an eviction meets the requirements of the lease . . . *and not whether a [public housing authority] has considered additional social and situational factors that HUD's regulations authorize, but do not require, a [public housing authority]* to consider in making its decision whether or not to pursue eviction of any family or individual whom, under the lease, the [public housing authority] has the legal right to evict.

*Id.* (emphasis added).

Based on this language, Foghorn argues that HUD clearly intended to restrict State courts' role in eviction actions to determining whether a tenant of federally-subsidized housing breached the lease. But HUD's response

cannot be read in a vacuum; it was written in response to a comment, and must be considered in that context.

The commenter suggested that HUD should modify the regulation in order to enable State courts to consider "all of the circumstances of the case" before ordering an eviction. In response, the Office explained that it would not implement this recommendation because HUD's authority to enact the regulations derived from the governing statute . . . and the statute does not provide courts with authority to exercise discretion over eviction actions for tenants of federally-subsidized housing. . . .

The Office further explained that, as far as [HUD was] concerned, the courts' role is limited to determining whether a tenant has breached the lease and that courts do not have the authority to decide "whether a [landlord] has considered additional social and situational factors that HUD's regulations authorize, but do not require[.]"

The Office's response to the comment makes it clear that [in the view of HUD] a state court could not, as a prerequisite to ordering eviction, consider whether a landlord's decision to initiate eviction proceedings was consistent with HUD guidelines. . . . But deciding whether a landlord's decision to seek eviction is consistent with *federal* policy is one thing; deciding whether eviction is appropriate based upon considerations of equity or other principles arising out of *state* law is quite another. The 2001 preamble does not purport to address the authority of state courts to exercise discretion pursuant to state statutory or common law.

*Id.* at 520-23 (footnotes omitted).

We agree with the intermediate appellate court's conclusion that "neither Handbook 4350.3 nor the preamble to 24 C.F.R. § 5.850 *et seq.* express[] an intent to preempt state laws such as the disputed provisions of RP § 8-402.1." *Id.* at 519. Indeed, by emphasizing that eviction may only take place through "judicial action pursuant to state and local laws[,]" Handbook 4350.3 indicates that the agency's understanding of congressional intent is for evictions by landlords in Section 8 housing to occur in state courts, subject to state landlord-tenant law. And, in the preamble to 24 C.F.R. § 5.850 *et seq.*, HUD merely

clarified that, in the agency's view, the federal statute did not expressly provide for reviewing a landlord's exercise of discretion in deciding whether to move to evict. HUD did not purport to address whether state courts have the authority to review an eviction for equitable considerations under state law.

In summary, we have determined that the mandatory lease provision in 42 U.S.C. § 1437f that provides that "any drug-related criminal activity" on or near Section 8 project-based housing by a tenant, household member, or guest "shall be cause for termination of tenancy" embodies two distinct congressional objectives. First, Congress broadly intended to reduce drug-related crime in public housing projects, particularly drug-related crime that threatened resident safety or the maintenance of public housing facilities. Second, Congress' more specific intent was that housing providers in Section 8 project-based housing would have substantial discretion to bring an eviction action in state court for any drug-related criminal activity, but only in accordance with state landlord-tenant law provisions and procedures. And we have determined that RP § 8-402.1(b)(1)'s requirement that a trial court review a breach of lease to determine if it is "substantial and warrants an eviction" does not conflict with either the broad or specific congressional intent. We therefore hold that the presumption against a judicial finding of federal preemption of a state statute is not overridden, and that RP § 8-402.1(b)(1) does not conflict with the mandatory lease provision of 42 U.S.C. § 1437f and its enabling regulations.[25]

_____

[25] The Court of Special Appeals likewise found no Congressional intent to require state courts to merely blindly approve a landlord's decision to evict without exercising any judicial review under state landlord-tenant law. *Hosford*, 229 Md. App. at 523-24. However, the intermediate appellate court also concluded that, hypothetically, Congress

51

Consequently, we hold that the Court of Special Appeals properly reversed the circuit court's grant of summary judgment in favor of Foghorn.

5. *Relevant Out-of-State Cases*

The parties have directed us to several out-of-state cases in which courts have considered whether federal mandatory lease provisions governing Section 8 project-based housing, or similar provisions in other federally funded housing programs, preempt state law. We conclude that our holding today that RP § 8-402.1(b)(1) is not preempted by the federal provisions at issue is consistent with the holdings of those out-of-state cases.

Several of the cases involve whether state "right to cure" provisions were preempted by federal mandatory lease provisions. *See Milwaukee City Hous. Auth. v. Cobb*, 860 N.W.2d 267 (Wis. 2015); *Hous. Auth. of Covington v. Turner*, 295 S.W.3d 123 (Ky. Ct.

"could have required state courts to order evictions upon a finding of a breach of the lease due to drug-related activity." *Id.* That may not be correct. As the Court of Special Appeals noted, "[a] Congressional mandate that state courts rubber-stamp a landlord's decision, without considering otherwise applicable equitable factors arising from state law," would necessarily "intrude upon not only the concept of comity that is the cornerstone of our federal system of government but also upon the functioning of the judiciary as an independent branch of government." *Id.* at 524. Indeed, it is possible that such a congressional mandate would trample so significantly upon the exercise of the traditional powers of the states, or the role of the courts to exercise their judicial function to decide the cases or controversies before them, that it would be deemed to violate the separation of powers principles of our Constitution. *See Bond v. United States*, 564 U.S. 211, 221 (2011) (holding that "[f]ederalism secures the freedom of the individual" because it "allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power"); *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1324 n.19 (2016) (noting that "Congress may not employ the courts in a way that forces them to become active participants in violating the Constitution") (citations and internal quotation marks omitted). As we have found Congress did not intend to require that state courts rubberstamp a landlord's decision to evict, we need not decide whether such a requirement would offend separation of powers principles.

App. 2009); and, *Scarborough v. Winn Residential L.L.P./ Atlantic Terrace Apts.*, 890 A.2d 249 (D.C. 2006). "Right to cure" provisions mandate that a landlord or public housing authority must afford a tenant the opportunity to cure or remedy a breach of lease within a reasonable period of time before moving to evict. As such provisions limit a landlord's discretion to bring an eviction, they would indeed seem to conflict with the congressional intent to vest a landlord or public housing agency with the discretion to bring an eviction based on any drug-related criminal activity on or near the public housing premises by a tenant, household member, or guest.[26] However, as previously discussed, RP § 8-402.1(b)(1) does not mandate that a landlord take certain steps prior to bringing an eviction action, or otherwise infringe upon the discretion afforded landlords under federal law. Thus, those cases are distinguishable from our holding today.

Other cases involve "innocent tenant" statutes, which mandate that a public housing authority or landlord cannot terminate the lease of a tenant who breached that lease due to drug-related or other criminal misconduct conducted on public housing premises by guests

---

[26] The District of Columbia Court of Appeals and Wisconsin Supreme Court have determined that "right to cure" statutes were preempted by federal law governing federally-subsidized housing because those statutes undermine a landlord's discretion. *See Cobb*, 860 N.W.2d at 276 (holding that "a right to cure past illegal drug activity is in conflict with Congress' method of achieving [its] goal by allowing eviction of tenants who engage in drug-related criminal activity"); *Scarborough*, 890 A.2d at 257 (holding that "the cure opportunity provided by [the State law] . . . would substitute for the landlord's discretion a mandatory second-strike opportunity for a tenant to stay eviction by discontinuing, or not repeating, the criminal act during the thirty days following notice"). However, Kentucky's intermediate appellate court has held that a "right to cure" provision was not preempted by federal law. *See Turner*, 295 S.W.3d at 127. The court reasoned that requiring a housing authority to give notice of a violation and permit a tenant to remedy it serves the overall purpose of the federal mandatory lease provisions to deter and reduce illegal drug use. *Id.*

or others when the tenant was not aware of the misconduct or could not have prevented it. For instance, in *Boston Housing Authority v. Garcia*, the Supreme Judicial Court of Massachusetts considered a state statutory provision governing public housing that it had previously interpreted to mean that a tenant was entitled to relief from lease termination if "special circumstances indicate that the tenant could not have foreseen the [criminal] misconduct or was unable to prevent it by any available means, including outside help[.]" 871 N.E.2d 1073, 1074 (Mass. 2007) (citations and internal quotation marks omitted). The Massachusetts court noted that the Supreme Court in *Rucker* had rejected a similar defense and held that a tenant could be evicted for the wrongdoing of a household member or guest even if the tenant was unaware of the misconduct. *Id.* at 1078 (discussing *Rucker*, 535 U.S. at 133-34). Thus, the court held that the Massachusetts statutory "special circumstances" defense would "substantially interfere" with the congressional objective behind 42 U.S.C. § 1467d, and was therefore preempted. *Id.*; *see also Hous. Auth. & Urban Redevelopment Agency v. Spratley*, 743 A.2d 309, 313-14 (N.J. Super Ct. App. Div. 1999) (holding that state statute that, in effect, prohibited eviction of "blameless tenants" was preempted by federal mandatory lease provisions); *City of South S.F. Hous. Auth. v. Guillory*, 49 Cal.Rptr.2d 367, 370-71 (Cal. App. Dep't Super. Ct. 1995) (holding that state statute that tenant contended required "a showing of knowledge or that the evicted tenant had reason to know of a family member's illegal conduct" was preempted by federal mandatory lease provisions).

As the Supreme Judicial Court of Massachusetts explained in *Garcia*, an "innocent tenant" provision has the effect of entirely removing the discretion of a public housing

agency or landlord to move to terminate tenancy for drug-related criminal activity in the absence of evidence that the illegal activity was known to the tenant. 871 N.E.2d at 1078 (noting that under an "innocent tenant" provision "[a] housing authority would . . . have lost the ability to terminate a tenant who violated her lease by not preventing her household member from engaging in drug related criminal activity, an ability Congress intends to preserve for housing authorities"). Thus, such provisions directly obstruct and conflict with the congressional intent to vest landlords with substantial discretion to bring an eviction action for **any** drug-related criminal activity on or near the leased premises by a tenant, household member, or guest.

However, unlike an "innocent tenant" statute, RP § 8-402.1(b)(1) does not mandate or require that a court deny an eviction if a tenant was not aware of drug-related criminal activity by a household member or guest. Instead, consistent with Congress' decision not to require eviction for any drug-related criminal activity whatsoever, a Maryland court applying RP § 8-402.1(b)(1) considers whether eviction is equitable under the circumstances. There may well be circumstances where a tenant contends that he was not aware of drug-related misconduct by a household member or guest, but the serious or violent nature of the illegal activity posed a safety risk to others in the housing complex, or caused substantial expenses for the landlord. In those circumstances, a court should find that the activity was a "substantial" breach of lease that "warrants eviction." Thus, the equitable review of a decision to evict does not conflict with Congress' intent to preserve the right of landlords to be able to evict such tenants in a state court eviction action.

We further note that several state courts have held that the kind of general equitable review of a breach of lease mandated under RP § 8-402.1(b)(1) does not conflict with federal law so as to require preemption. In *Garcia*, even though the Massachusetts Supreme Judicial Court had found the "special circumstances" defense preempted, the court noted that Massachusetts law "still requires 'cause' before a public housing tenancy may be terminated[.]" 871 N.E.2d at 1080. Therefore, the court held that "a housing authority's decision to terminate a tenant's lease is not beyond challenge in the Housing Court, based on the claim that the decision was made 'without cause' . . . or otherwise constituted an unlawful abuse of discretion[.]" *Id.* Ohio courts have similarly held "federal law on terminating a public housing tenancy of a guest does not preempt the equity authority of the court[.]" *Cuyahoga Metro. Hous. Auth. v. Harris*, 861 N.E.2d 179, 181-82 (Cleveland Munic. Ct., Hous. Div. 2006) (noting that federal law permitted the eviction of "innocent tenants" but affirming a magistrate's decision denying eviction of a tenant in a public housing project who "neither knew nor should have known" that a guest at her rental unit was involved in drug-related criminal activity and who cooperated with police search of her rental unit because the tenant had "established to the satisfaction of the court that equity prohibits her eviction from the premises"); *see also Dayton Metro. Hous. Auth. v. Kilgore*, 958 N.E.2d 187, 190-92 (Ohio Ct. App. 2011) (discussing *Harris*, and agreeing with its legal conclusion that under Ohio state law equitable considerations could bar forfeiture, but holding that such equitable considerations did not bar forfeiture when, unlike in *Harris*, the tenant had "[made] her apartment open and available to" her guests, and thereby "furthered her guests' criminal purposes to use that location to engage in drug-

56

related activity"); *Cuyahoga Metro. Hous. Auth. v. Davis*, 967 N.E.2d 1244, 1248-49 (Ohio Ct. App. 2011) (discussing *Harris* and *Kilgore*, and holding that trial court had properly granted judgment of eviction against public housing tenant whom a magistrate had clearly believed lied to police and who had left guests conducting drug-related activity alone in her apartment).[27]

## IV.
## CONCLUSION

In summary, we hold that RP § 8-402.1(b)(1) is not preempted under the doctrine of conflict preemption by federal provisions mandating lease terms for Section 8 project-based housing that provide that "any drug-related criminal activity on or near such premises

---

[27] The Court of Special Appeals determined that its holding that preemption did not apply was supported by another out-of-state decision, *Eastern Carolina Regional Housing Authority v. Lofton*, 767 S.E.2d 63 (N.C. Ct. App. 2014). *See Hosford*, 229 Md. App. at 526-27. In *Lofton*, North Carolina's intermediate appellate court held that in order to evict a tenant under North Carolina law, a landlord must prove, among other requirements, that "enforcing the forfeiture is not unconscionable." 767 S.E.2d at 67 (citations and internal quotation marks omitted). The North Carolina court concluded that the "unconscionability requirement" does not stand as an obstacle to the federal goals and purposes behind the mandatory lease provisions authorizing the termination of lease for drug-related criminal activity in 42 U.S.C. § 1467d(l)(6*)*. *Id.* at 69-71. Consequently, the North Carolina court held that the "unconscionability requirement" was not preempted by federal law, and that the trial court thus did not err in rejecting eviction. *Id.* at 71. However, the North Carolina Supreme Court subsequently rejected the intermediate appellate court's analysis, holding that "the equitable defense of unconscionability is not a consideration in summary ejectment proceedings" under North Carolina law. *E. Carolina Reg'l Hous. Auth. v. Lofton*, 789 S.E.2d 449, 452 (N.C. 2016). The North Carolina Supreme Court upheld the judgment of the intermediate appellate court, but on the separate grounds that the housing authority failed to exercise any discretion in deciding whether to move to evict the tenant. *Id.* at 454. As the basis for the North Carolina intermediate appellate court's ruling was explicitly rejected by the state's Supreme Court, we do not rely on that decision as persuasive authority.

. . . shall be cause for termination of tenancy[.]" 42 U.S.C. § 1437f(d)(1)(B)(iii). As described above, the only conflict preemption issue in this case is whether RP § 8-402.1(b)(1) "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]" *Arizona v. United States*, 567 U.S. at 399 (internal quotation marks omitted). Although the conflict preemption inquiry focuses on congressional intent, courts must also apply a presumption that Congress did not intend to preempt state law. *See Medtronic*, 518 U.S. at 485. And that presumption carries greater weight when Congress legislates "in a field which the States have traditionally occupied." *Id.* (quoting *Rice*, 331 U.S. at 230).

RP § 8-402.1(b)(1), which governs eviction actions for breaches by a tenant other than the nonpayment of rent, is part of Maryland's landlord-tenant law. Landlord-tenant law is an area traditionally regulated by state and local governments, and one that has never been federalized. Consequently, in this case, a heightened presumption against preemption applies in our analysis of Congress' intent.

With that presumption in mind, we determine the federal law and regulations at issue express both a broad and specific congressional intent. Broadly, Congress intended to reduce drug-related crime in federally-subsidized housing because such crime threatens resident safety and causes deterioration of the condition of housing that requires significant government expenditures. Specifically, Congress intended to vest landlords with substantial discretion to bring an eviction action against tenants for any drug-related criminal conduct in order to effectuate its broader aim.

The requirement in RP § 8-402.1(b)(1) that a court determine that a tenant's breach was "substantial and warrants eviction" does not pose an obstacle to or otherwise frustrate either Congress' broad or specific intent. Trial courts applying RP § 8-402.1(b)(1) can balance equitable considerations against the need to protect the safety of others tenants and the integrity of a housing project. And a tenant's actions that endanger others or cause significant property damages would properly be considered "substantial" and to "warrant[] eviction." Furthermore, the congressional emphasis on a landlord's discretion to *bring* an eviction action in state court based on any drug-related criminal activity that breaches a tenant's lease does not imply an intent to circumscribe the discretion of a state court to review that breach for long-standing state law equitable considerations. Consequently, we conclude that RP § 8-402.1(b)(1) is not preempted by federal law. Therefore, we shall affirm the holding of the Court of Special Appeals, and remand the case to the circuit court for further proceedings consistent with this opinion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**